UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SCOTT SKYLSTAD,<br><br>      Plaintiff,<br><br> v.<br><br>HENRI FISCHER,<br><br>      Defendant. | CASE NO. 2:18-cv-01636-JCC-BAT<br><br>**REPORT AND RECOMMENDATION** |

Before the Court are the motions for summary judgment of Plaintiff Scott Skylstad (Dkt. 41) and Defendant Henri Fischer (Dkt. 45), the only remaining defendant in this action. Plaintiff Skylstad sues Defendant Fischer, the chaplain at the Monroe Correctional Complex ("MCC") for denying him a Muslim prayer rug in violation of his First Amendment free exercise of religion and Fourteenth Amendment equal protection rights. For the reasons discussed herein, the Court recommends that Plaintiff's motion be denied, Defendant's motion be granted, and this case be dismissed with prejudice.

## MATERIAL FACTS

Plaintiff Skylstad describes himself as a student of Gnosticism. Dkt. 46, Declaration of Nicole Sinclair, Attach. A, Deposition of Scott Skylstad ("hereinafter Skylstad Dep."), Dep. 10:11-12; 11:10; and Attach. B, June 2017 Grievance ("It is noteworthy that I am a student of

REPORT AND RECOMMENDATION - 1

Case 2:18-cv-01636-JCC    Document 52    Filed 02/25/20    Page 2 of 19

1  Gnosticism – which, encourages the study of all religions. As such, I want to learn all about

2  Islam…. So this was the basis of my requests for a Muslim prayer rug.").

3   In the fall of 2016, Plaintiff Skylstad became friendly with fellow inmate Johnnie Shipp,

4  who shared his faith with Plaintiff Skylstad. Dkt. 36, Attach. A, Skylstad Dep. 11:10-18. Johnnie

5  Shipp is a black male and a devout Muslim. Plaintiff Skylstad is a white male. Dkt. 44,

6  Declaration of Johnnie Shipp, at ¶¶ 3-4.

7   Plaintiff Skylstad states that by January of 2017, he had become a devoted student of

8  Islam in the Shia Tradition, studied daily under Johnnie Shipp's mentorship, and maintained

9  notes from their meetings. Dkt. 42, Declaration of Scott Skylstad, ¶ 5. Plaintiff Skylstad learned

10 from his meetings with Inmate Shipp that he needed a prayer rug to complete the obligatory

11 prayers of the Islamic faith. *Id.*, at ¶¶ 6-7; Dkt. 44, Shipp Decl. at ¶¶ 6. However, a prayer rug is

12 not essential to Islamic prayer and Plaintiff Skylstad could have used clean towels or blankets, to

13 which he had access, as a substitute for a prayer rug. Dkt. 46, Sinclair Decl., Attach. A, Skylstad

14 Dep., 22:1-3.

15  Generally, the Washington Department of Corrections ("Department") permits inmates to

16 have prayer rugs in their cells. Dkt. 47, Declaration of Henri Fischer, ¶ 6 & Attach. A at 18. Any

17 inmate at MCC may purchase a prayer rug or arrange for a private donation from friends, family,

18 or community members. *Id.*, Fischer Decl., ¶ 6 & Attach. A at 11. From time to time, members

19 of a religious community or organization donate religious items to prisons. *Id.*, Fischer Decl., ¶

20 4. Because donated religious items are a limited resource, the Department reserves them for

21 inmates who will use them as the sponsors intended. According to DOC policy, these donated

22 items, which are distributed through prison chaplains, are available only to inmates "who have

23

REPORT AND RECOMMENDATION - 2

attended the majority of the programs offered for the religious faith group in the previous 6 months." *Id.*, Fischer Decl., ¶ 4. According to DOC Policy 560.200-Religious Programs:

    2.    Religious items may be obtained as follows:

        a.    The offender may purchase items through a Department approved vendor.

        ...

        b.    The offender's immediate family may purchase items for the offender through a Department approved vendor. Exceptions for non-immediate family may be requested and require Chaplain approval.

        …

        c.    The offender may receive items donated by community members.

        …

        2)    *Items donated to the facility will be available for offenders who have attended the majority of the programs offered for the religious faith group in the previous 6 months.*

        3)    Except as specified in Attachment 1, items may not be donated to specific offenders.

Dkt. 47, Fischer Decl., Attach. A, DOC Policy 560.200 at 11-12 (emphasis added). Plaintiff Skylstad was aware of and had access to these policies. Dkt. 46, Sinclair Decl., Attachment A, Skylstad Dep. at 6:2-6.

    Henri Fischer is the chaplain over all facilities within MCC, including the Twin Rivers Unit. Dkt. 47, Fischer Decl., ¶ 3. He distributes donated religious items in accordance with DOC policy and the donors' wishes. *Id.*, Fischer Decl., ¶ 4. Chaplain Fischer does not have prayer rugs for sale, but he does distribute prayer rugs and other religious items that inmates have purchased directly from a Department vendor. *Id.*, Fischer Decl., ¶ 6; Dkt. 43-1, Declaration of Darryl Parker, Exhibit A, Deposition of Henri Fischer (hereinafter "Fischer Dep.") at 26:2-16.

REPORT AND RECOMMENDATION - 3

Members of the Washington Islamic community have donated prayer rugs to inmates who are participating in the Muslim programs at Monroe. Dkt. 47, Fischer Decl., ¶ 5 & Attach. B, Donation Form. To simplify and shorten the Department's participation requirement (DOC Policy 560.200), Chaplain Fischer distributes the donated rugs to inmates who have attended at least six Friday Jum'ah (worship) services. *Id*., Fischer Decl., ¶ 5. This six-Jum'ah standard is well established and has been in place since at least 2014. *Id.*, Fischer Decl., ¶ 5. Chaplain Fischer has denied prayer rug requests from black inmates who did not meet the Jum'ah requirement and he has approved prayer rug requests from white inmates who did meet the Jum'ah requirement. *Id*., Fischer Decl., ¶ 7.

On March 20, 2017, Plaintiff Skylstad sent the following Offender's Kite to the Chaplain:

> I am requesting a prayer rug. I'm a non-suni [sic] Muslim and would like to be able to pray in my cell.

On March 23, 2017, Chaplain Henri P. Fischer replied:

> Since your cellie sent me exactly the same kite, I'd like to know what madhab (school of Islamic interpretation) you subscribe to?

Dkt. 47, Fischer Decl., Attach. C.

On the same day he received Plaintiff Skylstad' kite, Chaplain Fischer received a kite containing the same language from Plaintiff Skylstad's cellmate, Bradley Hickey. Dkt. 47, Fischer Decl., ¶ 8 & Attach. C at 2. Chaplain Fischer checked to see if either Plaintiff Skylstad or Hickey met the "six Jum'ah" attendance requirement. *Id.*, Fischer Decl., ¶ 9. Neither inmate had attended a single Jum'ah or any other Muslim events or programs. *Id.*, Fischer Decl., ¶ 9 & Attach. D, Callouts; Dkt. 46, Attach. A, Skylstad Dep. 10:20-21; 11:21-22. Because he suspected that Plaintiff Skylstad and Hickey were requesting prayer rugs for an improper purpose, Chaplain

REPORT AND RECOMMENDATION - 4

1  Fischer asked them to what "madhab (school of Islamic interpretation)" they subscribed. *Id.*,

2  Fischer Decl., ¶ 10 & Attach. C at 1-2. On March 23, 2017, Plaintiff Skylstad responded:

3      To answer your kite of 3/23/17:

4      I am studying (a student) of The Nation of Islam Shite tradition/interpretation.
    Because the Suni's belief system contradicts what I'm studying, I will be a private
5      practitioner. Please send me a prayer rug so I [illegible] can practice. I believe I
    am within my religious freedom of rights to do so.
6
Bradly Hickey sent a similar response, claiming to be a student of the "Nation of Islam." *See*
7
Dkt. 47, Fischer Decl., Attach. C, at 1-2.
8
    Through his training and experience, Chaplain Fischer has some understanding of Islamic
9
sects and the Nation of Islam. Dkt. 47, Fischer Decl., ¶ 11. The Nation of Islam is a well-known
10
black separatist group that actively protests Caucasians—especially Caucasian men. *Id.*, Fischer
11
Decl., ¶ 11. The group is not affiliated with traditional Islam; in fact, its racist beliefs are
12
antithetical to Islamic teachings. *Id.* Chaplain Fischer doubted that the Nation of Islam (or
13
anyone affiliated with that organization) would fraternize with Plaintiff Skylstad and Hickey,
14
who are both white men who were or had been associated with white supremacist groups within
15
the prison system. *Id.*, ¶ 12. Although Plaintiff Skylstad denies that he is a white supremacist, he
16
acknowledges that his prison records reflect that he is classified as belonging to a Security Threat
17
Group ("STG") as a biker/white supremacist and that Mr. Hickey was a member of the Aryan
18
Family. Dkt. 46, Attach. A, Skylstad Dep. 8:25-9:21; 16:18-25.
19
    Because neither Plaintiff Skylstad nor Hickey had attended six Jum'ah services, they did
20
not qualify for donated prayer rugs. Dkt. 47, Fischer Decl., ¶ 13. Chaplain Fischer denied their
21
requests, telling the men that the "prayer rugs were donated by Muslim sponsors for the active
22
participants in the Muslim program. Sorry." *Id.* & Attach. C at 1-2. Plaintiff Skylstad admits that
23
he did not meet the participation requirement. Dkt. 46-1, at 11:20-21; *see also* Dkt. 42 ¶ 15 ("I

REPORT AND RECOMMENDATION - 5

never claimed I was part of the DOC Muslim Program nor that I was deserving of rugs donated to the program."); Dkt. 49, at 6 (same).

Chaplain Fisher also thought Plaintiff Skylstad and Hickey were trying to deceive him, so when he responded to Skylstad's kite, he added, "And are you going to have me believe that a white man is part of the Nation of Islam? GIVE ME A BREAK!" Dkt. 47, Fischer Decl., ¶ 14 & Attach. C at 1. According to Chaplain Fischer, this statement reflected his doubt that Plaintiff Skylstad and Hickey were students of the Nation of Islam; it was not the reason he denied their requests for prayer rugs. *Id.*

On June 9, 2017, Plaintiff Skylstad submitted the following grievance:

> I want to grieve the fact that I am being discriminated against by Chaplain Fisher (on an on-going basis). I made two separate formal requests to Chaplain Fisher – requesting a Muslim prayer-rug (so that I can practice the Islamic religion in my cell [as a private-practitioner]).
>
> It is noteworthy that I am a student of Gnosticism – which, encourages the study of all religions. As such, I want to learn all about Islam – which, is based on the five pillars (the second pillar being to pray five times a day). So this was the basis of my requests for a Muslim prayer-rug. Chaplain Fisher denied me this religious item because I am "a white man."
>
> The remedy I request for this religious/racial discrimination is issuance of an Islamic prayer-rug (without further delay). Further, I request $100,000 in damages for the grievous violation of my well established constitutional rights.

Dkt. 46, Sinclair Decl., Attach. B.

Although Plaintiff Skylstad argues that he was never seeking issuance of a free prayer-rug, his grievance requests the "issuance" of such a rug "without further delay" and contains no language regarding the purchase of a rug. In addition, neither Plaintiff Skylstad nor his cellmate Hickey asked Chaplain Fischer how to qualify for or how to purchase a prayer rug. Dkt. 47, Fischer Decl., ¶ 15. Nor did they request permission to obtain a prayer rug through a private donation or purchase. *Id.*

REPORT AND RECOMMENDATION - 6

On August 16, 2017, Plaintiff Skylstad requested and was granted a transfer away from the Twin Rivers Unit. Dkt. 46, Attach. A, Skylstad Dep. 48:20-49:8; 53:6-13 and Attach. C, Movement History at 2, 3. Two months later, he was transferred to the minimum-security area (camp) of the MCC complex. *Id.*, Attach. C at 3 and Attach. A, Skylstad Dep. 29:23-24; 30:17-31:2.

In November 2017, Plaintiff Skylstad received a prayer rug. Dkt. 27, ¶ 44. But after he was transferred, Plaintiff Skylstad did not seek another mentor or other Muslims (either within the facility or in the community) to continue his study of Islam. Dkt. 46, Attach. A, Skylstad Dep., 23:22-24:1, 12-20; 27:21-28:4. He never attended a Jum'ah or Muslim study group. *Id.*, Skylstad Dep., 23:22-24:1. He never contacted the Muslim advisor at the facilities where he was housed. *Id.*, Skylstad Dep., 11:2-8; 24:12-14. And he did not continue to study the materials Mr. Shipp had given him. *Id.*, Skylstad Dep., 29:20-22.

Plaintiff Skylstad was released from prison on October 21, 2019. Dkt. 46, Sinclair Decl., Attach. C at 1.

## DISCUSSION

A.  Legal Standards

    1.  Summary Judgment Under Rule 56, Fed. R. Civ. P.

Summary judgment is appropriate if there are no genuine disputes regarding material facts, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). That is, disputes over irrelevant or unnecessary facts will not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To rebut a motion for summary judgment, a plaintiff must produce "significant, probative evidence" supporting the allegations in the complaint. *Liberty Lobby, Inc.*, 477 U.S. at 248. Conclusory allegations—whether in an affidavit, declaration, or pleading—do not qualify as probative evidence and are insufficient to create a genuine issue of material fact. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (citations omitted). Instead, "concrete, relevant particulars," are required to defeat a motion for summary judgment. *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988).

Summary judgment is also appropriate if a plaintiff cannot make a showing sufficient to establish the essential elements of his claims, even if there are genuine factual disputes on other issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If a plaintiff fails to adequately support an essential element of his claim, all other facts are rendered immaterial and the moving party is entitled to judgment as a matter of law. *Id.* at 323.

2. <u>42 U.S.C. § 1983</u>

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must show: (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law. *Leer v. Murphy*, 844 F.2d 628, 632 (9th Cir. 1988). "A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains.'" *Id.* (citation omitted; emphasis in original). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id.* (citations omitted).

REPORT AND RECOMMENDATION - 8

B.   First Amendment - Free Exercise

   1.   Legal Standard

The First Amendment's Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const., Amdt. 1. To establish a violation of the Free Exercise Clause, a plaintiff must show that the defendants prevented him from acting in a manner required by his faith, thus burdening the practice of his religion. *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

"A substantial burden places more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jones v. Williams*, 791 F.3d 1023, 1031-032 (9th Cir. 2015) (citing *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013). The defendant's interference must also be deliberate; a prison official's negligent or accidental interference with an inmate's ability to exercise his religious beliefs does not state a claim actionable under § 1983. *Mangiaracina v. Penzone*, 849 F.3d 1191, 1200 (9th Cir. 2017) (Bybee, J., concurring).

The Free Exercise Clause does not require the government to facilitate religious practice. Rather, the Clause delineates "'what the government cannot do to the individual,'" not "'what the individual can exact from the government.'" *Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) (citation omitted). So, while the government cannot interfere with religious practices, it need not fund them by purchasing religious items for inmates. *See Ward v. Walsh*, 1 F.3d 873, 880 (9th Cir. 1993) (holding that prison was not obligated to provide special religious clothing for inmate; allowing inmate to purchase religious clothing was enough); *Cruz*

1  *v. Beto*, 405 U.S. 319, 323 (1972) (Burger, C.J., concurring) ("There cannot possibly be any
2  constitutional or legal requirement that the government provide materials for every religion and
3  sect practiced in this diverse country.")

4      2.    <u>Analysis</u>

5      Because Plaintiff Skylstad did not have a right to a prison-funded religious practice, he
6  was not entitled to a free prayer rug. Additionally, the evidence presented reflects that Chaplain
7  Fischer never prevented Plaintiff Skylstad from acting in accordance with his faith and never
8  prevented Plaintiff Skylstad from exercising his religious beliefs. On the contrary, prison policy
9  allowed Plaintiff Skylstad to have a prayer rug and he could have purchased one or arranged for
10 a private donation. Dkt. 47, Fischer Decl., ¶¶ 6, 15 & Attach. A at 18. The evidence also reflects
11 that a prayer rug is not essential to Islamic prayer and Plaintiff Skylstad could have used clean
12 towels or blankets, to which he had access, which could have served as substitute prayer rugs.
13 Dkt. 46, Sinclair Decl., Attach. A, Skylstad Dep., 22:1-3.

14     Plaintiff Skylstad argues that he had only a limited supply of clean towels and blankets
15 and had to pray five times daily, so this was not an appropriate substitute. Dkt. 46, Sinclair Decl.,
16 at 22:1-6. Because prayer rugs are reused over and over, it not clear why a towel or blanket could
17 not also be reused. It is also undisputed that Plaintiff Skylstad was never prohibited from
18 obtaining a prayer rug; he could have obtained one through purchase, private donation, or by
19 complying with the participation requirement, but he chose not to do so.

20     Plaintiff Skylstad also argues that Chaplain Fischer intentionally and admittedly used
21 race to deny him access to a benefit that other Muslim offenders were permitted – "[Chaplain
22 Fischer] maintains a bigoted view that whites cannot be practicing Muslims." Dkt. 49 at 9. The
23 evidence does not reflect such a wide-ranging conclusion. The record reflects that Chaplain

1  Fischer doubted that Plaintiff Skylstad was studying with the Nation of Islam – this is different
2  than being a "student of Islam" as the Nation of Islam is not a religious organization, but a hate
3  group of black supremacists. Chaplain Fischer doubted Plaintiff Skylstad was affiliated with the
4  Nation of Islam because he is white and a suspected white supremacist. Dkt. 47-1, ¶¶ 12, 14.

5  Plaintiff Skylstad acknowledges that after he was first denied access to a free prayer rug,
6  he showed Chaplain Fischer's response to Mr. Shipp, who explained that the Nation of Islam is a
7  political movement of black supremacists. Despite this knowledge, Plaintiff Skylstad did not
8  resubmit his kite to correct any misunderstanding or clarify what he was studying with his
9  mentor or to explain why it was not suspicious that his cellmate was also claiming to be a study
10 of the Nation of Islam. In fact, Plaintiff Skylstad never asked Chaplain Fischer for help in
11 purchasing a rug or qualifying for a donated rug. Dkt. 47, Fischer Decl., ¶ 15.

12 Plaintiff Skylstad contends he never asked for a free prayer rug. However, as previously
13 noted, the language of his grievance contradicts this contention. In addition, the language in
14 Chaplain Fischer's response to his kite clearly indicates that he was being denied access to a free,
15 donated prayer rug because he had not met the requirements for receiving one ("These prayer
16 rugs were donated by Muslim sponsors for active participates in our Muslim program. Sorry.")

17 Contrary to Plaintiff Skylstad's suggestion, Chaplain Fischer's denial of his request was
18 not in contradiction of the Chaplain's earlier letter stating, "that all Muslim offenders working or
19 attending programs within the facility should be allowed to observe their Family Obligatory
20 Prayers." Dkt. 42-1, Ex. A. Plaintiff was not working or attending Muslim programs in the
21 facility. *See* Dkt. 46-1, at 11:20-21; *see also* Dkt. 42 ¶ 15 ("I never claimed I was part of the
22 DOC Muslim Program nor that I was deserving of rugs donated to the program."); Dkt. 49, at 6
23

1  (same). And, there is no evidence that Plaintiff Skylstad was ever prohibited from privately
2  praying in his cell.

3  Plaintiff Skylstad also argues that, although Chaplain Fischer did not "necessarily" need
4  to provide him with a free prayer rug, Chaplain Fischer "needed to have provided access to the
5  prayer rug in some way," such as informing Plaintiff Skylstad of the process of purchasing a
6  prayer rug. Dkt. 49, p. 8. Plaintiff Skylstad also contends that, pursuant to DOC Policies 560.100
7  and 560.200, Chaplain Fischer was required to instruct him in his religious exercise, which
8  included providing advice on how he could purchase a rug.

9  DOC Policy 560.100 relates to "Privileged Communication and Chaplains
10 Responsibilities," and states in part, that the Chaplain will "[c]onduct religious services, give
11 religious/moral instruction to facility offenders, and attend to offender spiritual requests";
12 "[a]ttend to the spiritual needs of all offenders as requested, regardless of faith tradition…;
13 [c]oordinate access to appropriate facility space and equipment…; [a]ssist and refer offenders
14 and their families to religious assistance programs, agencies, and other resources in the
15 community, as appropriate." Dkt. 46, Sinclair Decl., Attach. D (DOC Policy 560.100). DOC
16 Policy 560.200 on "Religious Programs" states in part, that "Chaplains will function as religious
17 services program specialists whose primary role is to provide access to meet the religious needs
18 of facility offenders by working with Department employees, contract staff, volunteers, the
19 religious community, and religious service providers. Dkt. 50, Second Parker Decl., ¶ 2, Exhibit
20 A at p. 3.

21 Although it is not entirely clear whether the foregoing policy language poses such a
22 burden on the Chaplain, the Court assumes, for purposes of this motion only, that it does.
23 However, by not telling Plaintiff Skylstad how to buy a rug, Chaplain Fischer did not violate the

Constitution. First, violation of a prison or DOC policy is not a per se violation of a constitutional right. *Davis v. Scherer*, 468 U.S. 183, 193-95 (1984); *Case v. Kitsap Cty. Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001) (noting there is no § 1983 liability for violating prison policy). Secondly, Chaplain Fischer's failure to tell Plaintiff Skylstad how to buy a rug did not substantially burden his religious practice. Plaintiff Skylstad argues that Chaplain Fischer's failure to tell him how to buy a rug placed "an impossible burden on him as he was unable to learn how to practice independent prayer and engage in conduct mandated by his faith." Dkt. 49 at 7. However, it is difficult to see how this placed an impossible burden on Plaintiff Skylstad when he had other ways of getting a rug, which were laid out in DOC policy to which he had access to, and he had suitable substitutes for a prayer rug. Here again, Plaintiff Skylstad does not suggest that he tried using a substitute for a prayer rug or tried to purchase a prayer rug and that Chaplain Fischer somehow interfered or prevented him from doing so.

There must be evidence that Chaplain Fischer placed more than an inconvenience on Plaintiff Skylstad's religious exercise and that by his inaction, tended to coerce Plaintiff Skylstad into acting contrary to his religious beliefs or exert substantial pressure on an adherent to modify his behavior and violate his beliefs. There is no such evidence.

Furthermore, Chaplain Fischer did not prevent Plaintiff Skylstad from continuing his study of Islam. He did not transfer Plaintiff Skylstad away from his mentor; Plaintiff Skylstad was transferred at his own request. Dkt. 47, Fischer Decl., ¶ 3; Skylstad Dep. 48:20-49:8; 53:6-13. And after his transfer, Plaintiff Skylstad made no effort to continue his study of Islam. He did not try to find another mentor; he did not contact other Muslims (either within the facility or in the community) to continue his study of Islam (Dkt. 46, Sinclair Decl., Attach. A, Skylstad Dep., 23:22-24:1, 12-20; 27:21-28:4); he never attended a Jum'ah or Muslim study group (*Id.*, Skylstad

REPORT AND RECOMMENDATION - 13

Dep., 23:22-24:1); he never contacted the Muslim advisor at the facilities where he was housed (*Id.*, Skylstad Dep., 11:2-8; 24:12-14); he did not continue to study the materials Mr. Shipp had given him. (*Id.*, Skylstad Dep., 29:20-22).

### 3. DOC Policy 560.200 – Religious Programs

DOC Policy 560.200 directs prison chaplains to reserve donated religious items for inmates "who have attended the majority of the programs offered for the religious faith group in the previous 6 months." Dkt. 47-1 ¶ 4; Dkt. 47-1, at 11-12. If a prison regulation does impinge "'on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" *O'Lone v. Shabazz*, 482 U.S. 342, 349-350 (1987)) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). When an inmate has other ways to exercise the constitutional right at issue, courts evaluating a prison regulation "should be particularly conscious of the measure of judicial deference owed" to prison administrators. *Turner*, 482 U.S. at 90.

Plaintiff Skylstad does not challenge this policy and in fact, admits that he did not meet the participation requirement. Dkt. 46-1, at 11:20-21; *see also* Dkt. 42 ¶ 15 ("I never claimed I was part of the DOC Muslim Program nor that I was deserving of rugs donated to the program."); Dkt. 49, at 6 (same). Instead, he argues that there is a question of fact regarding "the donor's expectation regarding distribution of the donated prayer rugs."

However, the material issue here is not what the donors expected, but whether the policy was applied fairly, *i.e.*, whether Chaplain Fischer gave donated prayer rugs to other inmates who did not meet the eligibility requirement, while denying one to Plaintiff Skylstad because he is white. As discussed in more detail below, Chaplain Fischer provided prayer rugs to inmates who met the participation requirement and he gave rugs to white inmates, whom he identified by name. Dkt. 43-1, Fischer Depo. at 36:11-38:20.

REPORT AND RECOMMENDATION - 14

In sum, Chaplain Fischer never prevented Plaintiff Skylstad from acting in accordance with his faith. DOC policy permitted Plaintiff Skylstad to have a prayer rug, and he had several ways to get one. Plaintiff Skylstad also had ready access to items that he admits could have worked as substitute prayer rugs. In fact, there is no evidence that Plaintiff Skylstad's religious practice was burdened at all. Any effort he had to expend to get a prayer rug was no more than an inconvenience.

Accordingly, it is recommended that Chaplain Fischer be granted summary judgment on Plaintiff Skylstad's First Amendment claim.

C.  Equal Protection

    1.  Legal Standard—Equal Protection

The Fourteenth Amendment's Equal Protection Clause "requires the State to treat all similarly situated people equally." *Hartmann v. Cal. Dep't of Corrs.*, 707 F.3d 1114, 1123 (9th Cir. 2013) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To bring a successful equal protection claim, a plaintiff must show that the defendant intentionally discriminated against him based on his membership in a protected class. *Id*. That is, he must produce evidence showing he was treated differently from others similarly situated to him and that the defendant chose this particular "action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

Conclusory allegations of discriminatory intent are not plausible when there are more likely explanations for the defendant's conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 681-682 (2009). A discriminatory purpose may not be presumed; "there must be a showing of clear and intentional discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8 (1944) (citation omitted).

REPORT AND RECOMMENDATION - 15

2. <u>Analysis</u>

Plaintiff Skylstad claims he was treated differently than the African American inmates who requested prayer rugs (Dkt. 41 at 6), but he provides no evidence to support this allegation. On the other hand, Chaplain Fischer attested that he provides prayer rugs to inmates who meet the participation requirement, regardless of race and he provided the names of white inmates to whom he gave rugs. Dkt. 43-1, Fischer Depo. at 36:11-38:20. Plaintiff Skylstad has provided no evidence to refute these facts. Instead, he argues that he need not identify similarly situated inmates who were treated differently because at the time, he was a practicing Shiite Muslim and Chaplain Fischer maintains "a bigoted view that Whites cannot be practicing Muslims." Dkt. 49 at p. 9. As previously discussed, this claim is contradicted by the facts. At the time he submitted his first kite, Plaintiff Skylstad was, in his own words, a practicing Gnostic, not a practicing Muslim, who was seeking to gain an understanding of the Muslim religion. In addition, Chaplain Fischer doubted that Plaintiff Skylstad and his cellmate would be affiliated with the Nation of Islam – a black supremacist political movement – because both are white men classified as belonging to white supremacist groups. This is much different than denying a prayer rug to someone because he is white. It is also curious why, after learning of the distinction between Islam and the Nation of Islam from his mentor, Plaintiff Skylstad did nothing further.

Plaintiff Skylstad relies on a deposition statement made by Officer Julius Monroe to support his equal protection claim. According to Officer Monroe, Chaplain Fischer stated that he "denied [Skylstad] a rug because that particular group of Muslims don't allow nonwhites—I mean, whites into their group." Dkt. 43, Parker Decl., Monroe Dep., 20:12-21.

At the outset, it is noted that this statement is hearsay, an out-of-court statement offered to prove the truth of the matter asserted and it is therefore, inadmissible. Fed. R. Evid. 801(a),

1  (c). Inadmissible hearsay statements are improper in affidavits and declarations. Fed. R. Civ. P.

2  56(c)(4). Moreover, Officer Monroe's statement merely indicates that Chaplain Fischer did not

3  give Plaintiff Skylstad a donated rug because the Muslim "group" (which was identified by

4  Plaintiff Skylstad in his kite as the Nation of Islam), does not allow white people to join. The

5  statement is neither incorrect nor does it provide proof of a discriminatory intent.

6  Plaintiff Skylstad also points to Chaplain Fischer's response to his kite as evidence of

7  discriminatory intent ("And are you going to have me believe that a white man is part of the

8  Nation of Islam? GIVE ME A BREAK!"). But the first part of Chaplain Fischer's response

9  clearly sets forth the reason why the request for the prayer rug was denied: "These prayer rugs

10 were donated by Muslim sponsors for the active participants in the Muslim program. Sorry."

11 Dkt. 47-1, at 24. Plaintiff Skylstad did not get a donated prayer rug because he was not an

12 "active participant" in the Muslim program. Plaintiff Skylstad has not provided enough to put

13 this fact in genuine dispute and in fact, admits that he was not eligible for a donated rug because

14 he had not met the participation requirement.

15 Plaintiff Skylstad baldly states that "Fischer has previously handed out prayer rugs,

16 including those that were donated, without putting other African American inmates through the

17 same level of scrutiny as he had put Skylstad [through]" (Dkt. 41 at 6) and, "African Americans

18 had access to a prayer rug and were in fact issued prayer rugs by Fischer. Fischer provided them

19 with prayer rugs without questioning their faith." (Dkt. 42, ¶ 21). However, Plaintiff Skylstad has

20 not identified these "other African American inmates," nor has he shown that these other inmates

21 had not attended a single Islamic event. Plaintiff Skylstad's speculation is insufficient to

22 establish a fact. Fed. R. Civ. P. 56(c)(2). It is also insufficient to preclude summary judgment.

23 *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979) (holding that

REPORT AND RECOMMENDATION - 17

conclusory, speculative testimony in affidavits and moving papers is insufficient to defeat summary judgment).

Finally, Chaplain Fischer has attested (and testified) that he has provided donated prayer rugs to both white and black inmates who met the "six Jum'ah" activity requirement. Dkt. 47, Fischer Decl., ¶ 7; Dkt. 43, Parker Decl., Ex. A, Fischer Depo. at 34-38. He has likewise denied requests from inmates—regardless of race or ethnicity—who did not meet the six Jum'ha requirement. Dkt. 47, Fischer Decl., ¶ 7. Plaintiff Skylstad, like others before him, was denied a donated rug because he did not comply with the requirements to receive one—not because of his race, ethnicity, or religious beliefs. *Id.*, Fischer Decl., ¶ 13.

Based on the foregoing, the undersigned recommends that Chaplain Fischer's motion for summary judgment be granted and the equal protection claim be dismissed with prejudice.

Because the Court finds that Chaplain Fischer is not liable on Plaintiff Skylstad's claims, it need not address Chaplain Fischer's alternative argument that he is entitled to qualified immunity.

**OBJECTIONS AND APPEAL**

This Report and Recommendation is not an appealable order. Therefore, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **March 17, 2020.** The Clerk should note the matter for **March 20, 2020**, as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.

The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed six (6) pages. The failure to timely object may affect the right to appeal.

DATED this 25th day of February, 2020.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 19